**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT SOUTH BEND**

| | | |
|---|---|---|
| INDIANA STATE COUNCIL OF CARPENTERS PENSION FUND, *et al.*,<br><br>Plaintiffs<br><br>v.<br><br>UNITED FLOORING, INC, *et al.*,<br><br>Defendants | ) | Cause No. 2:23-cv-430-PPS |

**OPINION AND ORDER**

This case raises the question of whether two separate companies are really a single entity masquerading as two. The defendants are United Flooring, Inc. ("UFI"), a small union flooring contractor, and Jack Laurie Floors, LLC ("JLF"), a much older and much larger, non-union contractor. UFI and JLF have overlapping ownership. The plaintiffs are five multiemployer fringe benefit funds and the Carpenters Union to which they serve. The case is a collection action brought under ERISA and Labor Management Relations Act. Plaintiffs contend that JLF is the alter ego of UFI, or alternatively that the two companies are a single employer. According to the Plaintiffs, this means that JLF owes millions of dollars in past due contributions to various union trust funds even though JLF is a non-union shop and was never a signatory to a collective bargaining agreement. The case proceeded to a bench trial on Plaintiffs' alter ego and single employer theories.

Having considered the parties' arguments and the evidence submitted,[1] I now make the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any finding of fact is deemed to be a conclusion of law, it is incorporated as such, and vice versa.

**Findings of Fact**

The Jack Laurie flooring business has been around for a long time. In 1950, Jack Laurie founded a commercial flooring company in Fort Wayne, Indiana, and ran the business until his retirement in 1989. Thereafter, Brad Alger bought the assets and carried on the business with the same workforce and the same equipment. [Stip. at ¶¶83-84.] In 1994, Jack's son—John Laurie (Laurie)—bought the business back from Alger and formed J. Laurie Commercial Floors, Inc., a C corporation. Laurie was its sole shareholder. The company did business as "Jack Laurie Floors." [Stip. at ¶85; Tr. at 247, 266]. Laurie's flooring business was non-union then, and it has remained non-union ever since. [Stip. at ¶¶14, 86.]

In 2000, defendant UFI was born out of a business need Laurie identified in the Fort Wayne market. [Stip. at ¶91.] Around that time, union general contractors (or GCs) in Fort Wayne were requiring union-signatory subcontractors, and only one flooring subcontractor served that market. Union contractors then approached Laurie and asked

---

[1] One note on citations: The parties' stipulated facts numbered 1-148 are included in the Final Pretrial Order [DE 75] on pages 5-21. The parties subsequently submitted additional stipulated facts numbered 149-237. [DE 84.] In referencing stipulated facts, I will uniformly cite to each fact's paragraph number, irrespective of which docket entry they are found in. The same is done for pages of the trial transcript, which spans two docket entries. [DE 88; DE 89.] Plaintiffs introduced their exhibits with numbers and Defendants did so with letters. I will cite to these admitted exhibits directly, as these documents have not been electronically filed on the docket.

him to "provide union numbers and be union signatory." [Tr. at 249.] Laurie recognized the gap in the market and the business opportunity, but he didn't want to convert his existing company into a union company. It had been successful as a non-union shop for many years in a state where (by Laurie's estimate) ninety percent of flooring work is done on a non-union basis. [*Id.*] Instead, on the advice of counsel, he decided to form a separate union company—UFI—with longtime friend and businessman Steve Klinger as the man to run it. [Tr. at 250-52.]

Before kicking off UFI, Laurie and Klinger met at Barnes & Thornburg's Fort Wayne office with their lawyer, Tuck Hopkins, and two union representatives: Mike Lauer, a union trustee whom Laurie described as "the leader of the union," and Will Klein, a business agent. [Tr. at 250-52.] The purpose of the meeting, per Laurie, was to have a "route to market." He wanted to be transparent about his plan and to secure the Union's cooperation rather than proceed "behind closed doors." [Tr. at 251-52.] Laurie testified that Lauer made two things clear at the meeting: the workers on union jobs had to be paid union scale and benefits, and the union company had to be a separate company. Plaintiffs provided no evidence disputing this account. At the meeting, Laurie and Klinger asked specifically about "backroom functions," explaining that the new, small company would not be able to support its own warehouse, accounts payable, accounts receivable, and other backroom functions, and they left the meeting with the understanding that shared administrative services of that kind were entirely acceptable to the Union. [Tr. at 252-53.] Laurie would not have started UFI otherwise. [Tr. at 253.] Klinger's testimony matched Laurie's account. He testified to an agreement

at the meeting that UFI's tradespeople would be union members and those doing indirect management and administrative work would not be. The latter would be outsourced. [Tr. at ¶308.]

Klinger has been UFI's president and majority owner since its incorporation on November 30, 2000. He owns 55% and Laurie owns 45%. [Stip. at ¶¶5, 15-16, 19; Tr. at 253]. At its inception, UFI signed with the Union and has been signatory to successive agreements ever since. It's bound through a Memoranda of Agreement to the Union's collective bargaining agreements and the Trust Funds' trust agreements. It's obligated to report hours on a monthly basis, to pay contributions to the Trust Funds and wage deductions to the Union at the negotiated rates. Upon request, UFI also needs to provide information to the Fund's auditors needed to verify contributions. [Stip. at ¶¶4-10, 92.].

Two relevant corporate developments followed UFI's creation. First, Laurie created John Laurie Management, LLC ("JLM ") in 2006 as a centralized back office for all of his companies. [Stip. at ¶22; Tr. at 254-56.] Laurie maintains a portfolio of businesses that operate under the umbrella brand "Jack Laurie Group," and that portfolio created a need for shared "backroom" services—accounting, payroll, human resources, IT services, etc. Without a centralized back office for his companies, each business would need to handle those administrative functions in-house, pulling its employees away from the companies' core services. [Stip. at ¶¶94-96; 129-30; Tr. at 256-57.] JLM has provided services such as accounting and finance, human resources, IT support, estimating and project administration, warehousing and logistics, and

marketing to as many as nine companies, including Bar Flooring, a company in which Laurie had no ownership interest whatsoever. [Stip. at ¶¶ 26, 94; Tr. at 259.]

Second, in 2010, on the advice of counsel and accountants, Laurie converted J. Laurie Commercial Floors, Inc. into Jack Laurie Floors, LLC. The decision to change the corporate form was driven by tax advantages. Other than changing the corporate form, nothing changed with respect to ownership, customers, employees, or vendors. [Stip. at ¶11; Tr. at 265-67.]

Now let's discuss the two companies at issue—UFI and JLF—what they do and who they do it for. The parties have stipulated to the essential structure of the companies. UFI and JLF are what's described as a "double-breasted" operation, with UFI being the union shop and JLF the non-union shop. [Stip. at ¶23.] Starting with ownership, JLF and UFI are co-owned by the same two people, though in different proportions: Klinger owns 55% of UFI and 3.3% of JLF; Laurie owns 45% of UFI and 91.7% of JLF. David Foellinger holds the remaining 5% of JLF. [Stip. at ¶¶15, 19, 89.] Laurie is the CEO of JLF and the corporate secretary of UFI. He draws a salary from JLM and distributions from JLM, UFI, and JLF. [Stip. at ¶¶20-21.] Klinger is the President of UFI and receives regular pay and distributions from that company. [Stip. at ¶¶16-17.] Klinger describes himself on LinkedIn as the Chief Information Officer of the Jack Laurie Group, and JLF's website listed him as its Chief Technology Officer ("CTO") on the "Team" Page. [Stip. at ¶18; Exs. 23, 24] He provides technology consulting services to JLF under a written services agreement between the two companies, and UFI bills JLF for his services. [Stip. at ¶¶131-32.]

UFI installs commercial flooring for union-only general contractors or building owners who specify a union labor requirement. JLF also continues to install commercial flooring, but only for non-union contractors and building owners. [Stip. at ¶¶24-25.]. Of note, UFI does commercial flooring and nothing else. [Stip. at ¶¶104-05.] JLF, on the other hand, is a diversified interior contractor with multiple business units offering numerous services beyond commercial flooring. Those include janitorial and construction cleanup services, painting, drywall finishing, acoustic ceilings, sport floors, residential flooring, and polished concrete. [Stip. at ¶¶87, 90.]

The size, scale, and scope of each company are worlds away from one another. UFI's work is concentrated in Fort Wayne. Since 2019, roughly 95% of its revenue came from the same eight Fort Wayne-based customers, and 98% of its jobs are done within sixty miles of the city [Stip. at ¶108; Tr. at 271.] By contrast, JLF's work has stretched far beyond Fort Wayne and Indiana's borders, having performed jobs in Kentucky, Tennessee, Michigan, Illinois, Ohio, and Georgia. [Stip. at ¶88.] During the audit period in this case, JLF averaged 325 full-time equivalent employees against UFI's six. [Tr. at 260-261.] Laurie put the companies' annual revenues at roughly $70 million for JLF and $2.5 million for UFI. [Tr. at 272.] Between 2019 and 2023, JLF employed 1,181 people in all. [Stip. at ¶145.] As of October 2025, UFI employed seven—five union field employees, one field superintendent, and its president, Steven Klinger. [Stip. at ¶¶109-10.]

There is some customer overlap between the two companies. Between 2019-2024, UFI had twenty-five customers, fourteen of whom also did business with JLF. [Stip. at

¶¶76-77.] For example, one of the common customers that the parties focus their attention on is C3 Construction Services. C3 Construction did indeed do work for both companies. But the work was separated by three years, and it was different kind of work: UFI did commercial flooring for C3 Construction in 2019 while JLF's work for C3 Construction was done by its specialty surfaces division and it was done on an entirely different project. [Stip. at ¶136.]

JLF and UFI were also careful in how they presented the two companies to the public. For example, UFI has a dedicated website and its own email domain. [Stip. at ¶¶ 34-36.] JLF's website is located at JackLaurieGroup.com, the site of the umbrella brand under which the portfolio of Laurie companies operates. The parties stipulated that JLF uses this as its website and that "@JackLaurieGroup.com" is functionally the JLF email domain. [Stip. at ¶¶37-38, 129-30.] The two sites shared a common look, and most of the navigation links on UFI's site (*e.g.*, "careers," "contact us," "about us," "news," "residential," "cleaning," "specialty," and "careers") redirected the user to the Jack Laurie Group website. [Tr. at 92-93; Exs. 25, 26.]

Where does JLM fit into the mix between UFI and JLF? In essence, as noted above, JLM provides a back-office function. Its employees handle accounts payable and receivable for both companies, prepare customer invoices, and enter vendor invoices for both. [Stip. at ¶¶27-29; Tr. at 173.] JLM leases the warehouse and office space its clients use, and it provides warehousing, logistics, and jobsite delivery. JLM also puts its clients' logos on its trucks, so JLF's and UFI's logos can both be found there. [Stip. at ¶¶82, 100-02, 147; Tr. at 118, 120; Ex. 29.] Finally, both companies also have their own

written service agreements with JLM, which have been continuously in place since inception. [Stip. at ¶96; Tr. at 258-59.] JLM's services are billed monthly and paid by the company that receives them at 120% of cost. [Stip. at ¶¶97-98.]

At trial, Thomas Searl—JLM's controller—explained JLM's billing structure. The shared accounting services are billed based on revenue. Warehouse charges are allocated by a client's percentage of usage. UFI doesn't rent any office space from JLM,[2] so they don't get billed for rent, just for its warehouse usage. [Tr. at 190-92.] JLM maintains both companies' records separately, including their financial statements, tax filings, and invoices. The financial records for both companies live within JLM's accounting software, though in separate databases. [Stip. at ¶¶99, 123.]

JLM employees have moved between the Jack Laurie Group companies over the years. For example, Diane Harrington, JLM's former payroll benefit manager, came from JLF. [Stip. at ¶¶60-62.] Andrew Sanders worked as the skill trades acquisition manager at JLM until leaving the company in 2025. He previously worked for JLF and has worked as superintendent for both UFI and JLF at different times, and for a period he provided field superintendent services to UFI while being paid only by JLF. [Stip. at ¶¶41-44.] The same was true of Anthony Anzini, who worked as a superintendent for UFI between October 2019 and June 2021. UFI compensated JLF for the services of Sanders and Anzini pursuant to an agreement between the parties. [Stip. at ¶¶45, 143-44.] Since June 2021, UFI has had its own field superintendent, Brandon Bermes, who

[2] UFI's address is a P.O. Box. While it doesn't have an office, it rents a single cubicle from JLM's Fort Wayne office for use by one UFI employee, Brandon Bermes. Bermes spends little time at this cubicle and only utilizes it for tasks like printing, when needed. [Stip. at ¶125.]

has been on UFI's payroll continuously except for the months of May through August 2022, when he was paid by JLF. [Stip. at ¶¶46-49.]

One employee, Richard Melton, occupied a role as a shared estimator, and he was a focal point of Plaintiffs' case-in-chief. Richard Melton is currently an estimator and project manager for JLM. [Stip. at ¶63.] He started as an estimator for the Jack Laurie flooring business in 1990, and when UFI came into being, he started doing estimating for UFI as well. [Tr. at 135-36.] Until 2023, UFI contracted with JLF to perform bidding and estimating services. Since 2023, UFI contracts with JLM for these services. [Stip. at ¶137.] As a JLF estimator, he solicited pricing and prepared bids with the intention of winning contracts for the company. [Stip. at ¶66; Tr. at 135.] He has held primary estimating responsibility for UFI since it was created in 2000, and he testified that he submitted 75-80% of every bid UFI has made in its 26-year history. [Stip. at ¶139; Tr. at 155.] He was a JLF employee until 2023 and has worked at JLM since. [Tr. at 161.] Regardless of where he worked at any given time, Melton's time spent performing bidding estimating services for UFI has always been billed to UFI per service agreements in place at the time. [Stip. at ¶139.] JLM pays his salary and commissions, but his bonus is based on all of the work he performs regardless of who it is for. [Stip. at ¶¶64-67.] He reports to Dave Foellinger, though he answers "somewhat" to the owners and discusses sales and booking with both. [Tr. at 150-51.] At the end of 2025, Melton handed UFI's estimating work to another employee, and he now serves mainly as a project manager, working with the field superintendent to schedule and complete work once a contract is won. [Tr. at 137-38.]

As a shared estimator between JLF and UFI, Melton had to decide which company bids a job. According to Melton, whose testimony I credit on this point, he lets the customer decide. [Tr. at 153.] In other words, it depends on the general contractor. Union general contractors require union labor in their bid invitations, and every such invitation is therefore bid through UFI. [Tr. at 141-43.] He didn't receive bid requests from non-union general contractors, because those GC's request bids directly from project managers who hold the relationship with those GCs, and JLF develops its customers through its own outside sales teams. [Tr. 143, 147]

As a shared estimator, Melton didn't do much bidding for JLF at all. Roughly 95% of his work in recent years has been for UFI, and his directive from both owners was to "grow UFI." [Tr. at 138.] He did not recall a single instance where a contractor specifically required a non-union subcontractor. The only bids he received without labor requirements were for public works projects, which make up—as Melton estimated—about one percent of the companies' projects. Though Melton would ordinarily "funnel" a request with no labor requirement to JLF, those are so few and far between that he said UFI and JLF don't really compete. [Tr. at 145.] Indeed, Melton did not recall any time where he submitted a bid on the same project for both UFI and JLF, and he has never diverted work from UFI to JLF or been asked to do so. [Tr. at 142, 155-57.]

One particular project was the subject of a lot of testimony at trial—the Noble County Courthouse renovation project. Weigand Construction (a union GC) invited UFI to bid on the flooring work for the project. In 2023, to lighten Melton's workload, JLM

shifted some of his UFI responsibilities to a different JLM employee, Bryan Bobay, whom Melton had trained [Stip. at ¶140; Tr. at 141.] In October 2023, Bobay submitted JLF's bid for the courthouse project from his UFI email address. [Stip. at ¶56; Tr. at 121; Ex. 27.] On the surface, this is a relatively strong point for Plaintiffs showing that the two companies were in fact operating as one. But Kyle Gresham, the Union's own business representative, took the sting out of this evidence. Gresham explained that this was essentially a public works project, which allowed union GCs—despite the subcontractor clause of the CBA—to request bids from non-union subcontractors. [Tr. at 121-22.] In other words, this was the one-percent category of project that Melton said the owners direct to JLF. While it's unusual that Bobay inadvertently used a UFI email address for a JLF bid, it was an obvious mix-up. Melton explained that he has sent UFI bids from both his UFI and Jack Laurie Group email addresses because sometimes customers wouldn't receive emails from the Jack Laurie Group domain. [Tr. at 149.] In all events, it is plain from the bid itself that it was made by JLF—the bid reads: "Bidder: Jack Laurie Floors, LLC." [Ex. 27.]

Plaintiffs also showcased a few other occasions where the JLF and UFI lines got crossed; specifically, where JLF-paid workers performed work on a UFI project. First, there was the 2018 renovation project of a Comcast building in Fort Wayne. It was a UFI project for a union GC. A union representative (Gresham) visited the site and found JLF employee Dean Wolfe, the lead installer, installing bathroom partitions with another JLF-paid installer. [Tr. at 103-06.] In response, Gresham called Wolfe's supervisor, JLF project manager Brent Campbell, and then contacted Andrew Sanders, who at the time

was superintending UFI's work. The crew packed it up for the day, and when the work resumed, UFI installers completed it. [Tr. at 107-08.]

Next, at the Indiana Institute of Technology project (a UFI flooring job), Sanders asked Gresham about supplementing the installation crew with JLF employees given the size of the project and the lack of manpower. The job was ultimately completed by a mix of JLF and UFI employees. [Tr. at 108-10.].

Then there was a Kohl's project in Fort Wayne in the summer of 2022. Gresham visited the site after getting word that JLF men were working a UFI project for a union general contractor, Woods Construction. He spoke with Woods' superintendent and with the workers about the issue and learned they were not being paid the union rate. [Tr. at 114-16.] Gresham filed a grievance. That grievance never reached arbitration because the defendants "made the workers whole" by paying them the difference between what they received and what was owed under the full union package.[3] [Tr. at 116-17.]

Finally, there was the Riverfront at Promenade Park project, another UFI job, in the summer of 2022. Gresham was advised that JLF workers were on the job site. When he visited the site, he found a four-man crew consisting of UFI apprentice Austin Maxey and three JLF installers—Damien Carlson, Josh Parrish, and Phil Harrison. They were paid between $16 and $22 an hour, well below the union rate which at the time exceeded $50 an hour [Tr. at 110-13.] Gresham contacted Steven Klinger and UFI field

[3] The "full union package" refers to the hourly rate and benefits package (*e.g.*, health insurance, annuity, and pension) union members are owed under the collective bargaining agreement. [Tr. at 112.]

superintendent Brandon Bermes about the issue. Both told Gresham it was an oversight that JLF men were sent out for the job. [Tr. at 112-13.] The workers were ultimately paid union scale. [Tr. at 127-28.] The stipulated payroll records are consistent with this. Carlson, Parrish, and Harrison appear on UFI's payroll in May and Spring of 2022, and Wolfe appears on UFI's payroll in April 2018, the time of the Comcast job. [Stip. at ¶¶ 165, 177, 210, 233-34.]

These four projects are the only instances in the record where JLF-paid employees worked a UFI job. Notably, in the two instances where pay was at issue, the workers were made whole, and the other two were finished by UFI's crew.

Finally, I turn to the companies' finances. Plaintiffs spent significant time at trial trying to show a single pocketbook. They did not. On the stipulated facts alone, the two companies maintain separate incorporation, tax identification numbers, retail certificates, annual reports, tax returns, balance sheets and financial statements, supplier accounts with separate credit limits, bank accounts, lines of credit, term notes, property and casualty insurance, Paycom payroll accounts drawing on each company's own checking account, purchase-order systems with separate credentials and vendor databases, and—aside from this lawsuit—the use of separate law firms. [Stip. at ¶¶79, 113-23, 148.]

As for how UFI staffs its projects, Klinger explained that UFI faces a "highly variable" workload with the projects that come in. When a project is too big for UFI's core installers, the first call for manpower is to the union hall. But the hall's pool of qualified flooring installers is small and often already spoken for. The second resource

is a rolodex of capable installers in and out of town, and the third is JLF, which employs hundreds of qualified installers. [Tr. at 307-08.] Klinger explained these supplementary installers are asked "to come on a project basis and work for UFI," and when they do, they are paid [a]lways according to the CBA." [Tr. at 308.] Plaintiffs provided no evidence that UFI failed to pay these workers the union package or to report and contribute to the Trust Funds on those installers' UFI hours.

At trial, Plaintiffs fastidiously worked through JLF's general ledger, asking JLM's controller, Thomas Searl, about entries they found questionable. Here's what emerged. First, the companies make short-term intercompany loans to one another. When either company reaches its line of credit, it arranges a short-term note from the other (or sometimes from a third Laurie company). [Tr. at 186-87.] These notes are entered in dedicated note-payable and note-receivable accounts, and they are repaid via ACH when receivables come in. None have lasted a month. [Tr. at 189-90.] Examples at trial included intercompany loans and repayments ranging between $66,000 and $180,000. [Tr. at 204, 212-13.] Searl did not have the authority to move the money himself. He needed approval from his bosses. [Tr. at 228.]

On cross-examination, Searl explained that the intercompany loans happened very infrequently. [Tr. at 227.] He also explained that these loans were always repaid, that the companies are not interdependent on one another, and that there is no cross-collateralization between the companies' separate lines of credit or commingling of the financial records, which are kept in separate databases. [Tr. at 227-29.]

Second, third parties occasionally sent money to the wrong company, but those instances were corrected when identified. For example, one entry read "Weigand Construction check paid to UFI." [Tr. at 212.] Searl explained that Weigand is "notorious for putting the wrong companies on bills," and that UFI deposited the check, put the money in their account, and then sent the funds to the proper company—JLF. [*Id.*] Other examples included purchasing agents using the wrong company's card, and Searl explained that in such instances, the payments were properly rebilled. [Tr. at 208-209, 224-25.]

Next, Plaintiffs highlighted some entries describing "equity" moving between the companies. [Tr. at 200-01] Searl had seen only one such entry before trial, and he explained that equity cannot be transferred between two companies. The label reflects something booked within the equity account, most likely owner distributions. [Tr. at 196.] The one entry he investigated turned out to be a year-end distribution of JLF profits to Klinger, who owns 3.3% of JLF but draws his pay from UFI. [Stip. at ¶17; Tr. at 196-97.] Because Klinger is not on JLF's payroll (he's a small owner, not an employee), the pro rata distribution was issued to him as a Paycom check out of UFI's payroll account, rather than as a check from JLF. JLF then paid the money back to UFI. [Tr. at 197-98.] When shown a June 2021 entry labeled "equity transferred to UFI," Searl said the $10,000 payment reflected as a transfer from JLF to UFI was likely the same type of distribution payment as the one he had previously investigated. He explained this practice of running distributions through payroll predated his role at JLM, and that it was ultimately discontinued. He also explained that when these JLF distributions

happened through UFI, JLF would "unwind" them by repaying the money to UFI—a cumbersome practice that prompted JLF to stop doing it. [Tr. at 201, 218.]

JLF managed its books without a controller for some time before Searl arrived, and they were "in disarray a little bit back then," as Searl explained. [Tr. at 193, 209.] Before dedicated accounts existed for small rebilled costs, entries that had nothing to do with loans (*e.g.*, auto-insurance bills, a cell-phone bill, and a Lowe's charge) were run through the note-receivable account, which Searl said had been used "as a clearing account" while the books were being straightened out. [Tr. at 205-09.] Second, the software automatically (and incorrectly) labeled batches of uploaded transactions as payroll entries, and mis-entries were reversed to zero, including in an account someone labeled "do not use ever." [Tr. at 207, 216-17, 221-23.]

I find Searl credible and his explanations of the entries sensible. Plaintiffs offered nothing to contradict them. I attribute any oddities in the books to isolated errors cherry-picked by Plaintiffs from hundreds of thousands of transactions. [Tr. at 227.] As to the occasional transfers between the companies—which Searl said were rare and always repaid—these do not show commingling of funds. On the contrary, they show arm's length loans that were promptly paid back which establishes that each company was separate and independent of one another.

The Trust Funds have audited UFI about every three years for its entire existence, and until the audit preceding this lawsuit, they never once inquired into JLF or suggested that JLF was bound by UFI's agreement as an alter ego or single employer with UFI. [Stip. at ¶128; Tr. at 253-54, 261.]

**Conclusions of Law**

Section 515 of ERISA requires an employer "obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement" to make them "in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. UFI is an employer bound by this section, and no one contends it has fallen short of its obligations. The target here is JLF.

Plaintiffs seek an extraordinary remedy. Recall that JLF is a company with hundreds of employees, taking in $70 million a year in revenue. Plaintiffs want to hold JLF to the terms of a contract entered into by its sister company (UFI) that it never signed and had no intention of being bound by. In contrast to JLF, UFI is a union shop with seven employees and $2.5 million in revenue. If Plaintiffs are successful with their topsy-turvy theory, JLF would be responsible for millions of dollars in damages.

Plaintiffs' case rises or falls on two judicially developed doctrines for binding a non-signatory company to a CBA: alter ego and single employer. Plaintiffs contend that JLF is the alter ego of UFI or alternatively that JLF and UFI are a single employer. [DE 75 at 2, 4-5.] The two theories of liability overlap in parts, but they are distinct in one key aspect. While an alter ego theory requires proof of an unlawful motive, a single employer theory does not. *Trs. of Pension, Welfare & Vacation Fringe Ben. Funds of IBEW Loc. 701 v. Favia Elec. Co.*, 995 F.2d 785, 788-89 (7th Cir. 1993); *see also Bd. of Trs. of the Pipe Fitters Ret. Fund, Loc. 597 v. Am. Weathermakers, Inc.*, 150 F. Supp. 3d 897, 908 (N.D. Ill. 2015) ("The alter ego doctrine is more demanding than the single employer doctrine

because the former involves questions of motive and intent.") Plaintiffs bear the burden of proof on each. As I explain below, they have not carried that burden on either theory.

## I. The Alter Ego Theory

To determine whether one company is the alter ego of another, courts look to several factors, including whether they have "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *McCleskey*, 897 F.3d at 903 (quoting *Int'l Union of Operating Eng'rs, Local 150 v. Rabine*, 161 F.3d 427, 433 (7th Cir. 1998)); *Bd. of Trs. of Chicago Plastering Inst. Pension Tr. Fund v. William A. Duguid Co.*, 761 F. Supp. 1345, 1348 (N.D. Ill. 1991). As discussed above, the alter ego analysis also incorporates an intent component, requiring "a fraudulent intent to avoid collective bargaining obligations." *McCleskey*, 897 F.3d at 903.

The doctrine exists to prevent employers "from gaining an unearned advantage in his labor activities simply by altering his corporate form." *NLRB. v. Dane Cnty. Dairy*, 795 F.2d 1313, 1321 (7th Cir. 1986). It focuses on "the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets." *Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987) (citation omitted). Accordingly, the typical alter ego case arises when a union company dissolves and is resurrected as a non-union shop or when a union company creates a non-union counterpart and diverts its work there. *See id.*; *Duguid.*, 761 F. Supp. at 1348; *Cent. States, Se. & Sw. Areas Pension Fund v. Sloan*, 902 F.2d 593, 596-97 (7th Cir. 1990).

Here, Plaintiffs are applying the doctrine backwards. On their theory, the alter ego is a non-union company that came first—by fifty years no less—not one that was created later to evade union obligations. *See Architectural Iron Workers Loc. No. 63 Welfare Fund v. United Contractors, Inc.*, 46 F. Supp. 2d 769, 788, 790 (N.D. Ill. 1999) ("This lawsuit simply does not fit into the typical case in which a union company forms a non-union company in order to avoid the obligations of a principal's collective bargaining agreement."). Plaintiffs are correct that the doctrine does not require the signatory to disappear. Indeed, a signatory and its alter ego can coexist, and the order in which the entities were formed is not dispositive by itself. *Sloan*, 902 F.2d at 596-97; *Laborers' Pension Fund v. Green Demolition Contractors, Inc.*, No. 15 C 5633, 2016 WL 74682, at *3 (N.D. Ill. Jan. 7, 2016).

But their theory is fraught with problems, nonetheless. At closing, I asked whether there were cases like this one—a longtime non-union company that creates a union counterpart—and I invited the parties to address the question in their final submissions. [Tr. at 354-55.] There are a few, and they aren't helpful to Plaintiffs. In *Architectural Iron Workers,* the district court explained that it "seems somewhat illogical, if [the non-union company] merely sought to avoid the union contribution requirements altogether, for it to create an entity [] to do installation work and then allow it to become a signatory to the very collective bargaining agreement it was trying to avoid." 46 F. Supp. 2d at 788. More recently, in *Dynamic Garage, Inc.*, a non-union trucking company had operated for a decade before its owner's father formed a small union affiliate specifically to keep two union mechanics employed with benefits. *Auto.*

*Mechanics' Loc. No. 701 Union & Indus. Pension Fund v. Dynamic Garage, Inc.*, No. 16-CV-08967, 2018 WL 4699842, at *2 (N.D. Ill. Sept. 30, 2018). The court held that "[a]ny presumption that Dynamic was created with an unlawful motive to avoid a contribution obligation is fatally undermined by what was actually a union-favorable genesis of Dynamic." *Id.* at *4.

That same reasoning applies here. As I see it, Plaintiffs are contending that Mr. Laurie founded a union company in order to avoid union obligations that it voluntarily took on. That's not sensible. Indeed, prior to the formation of UFI in 2000, the Jack Laurie flooring business had been successful as non-union company for half a century, and it owed the Union nothing. So why would Laurie create a new company and sign a CBA if he never intended to honor it? Putting this inconsistency aside, I take up each of the alter ego elements in turn.

First, there's common ownership. That's an easy one for Plaintiffs. Laurie and Klinger together own all of UFI and 95% of JLF. [Stip. at ¶¶15, 19, 89.] But the alter ego formulation asks whether ownership is "substantially identical." This factor deserves little weight given the inverse ownership shares. Klinger is the majority owner of UFI with a 55% stake. He holds only 3.3% of JLF. Laurie, on the other hand, holds a 91.7% share of JLF and 45% of UFI. Each company therefore has a different controlling owner. So, the ownership isn't substantially identical. Furthermore, Klinger has run UFI for over 25 years and draws his salary from it. [Stip. at ¶¶16-17.] As a majority owner and employee, he therefore has an economic stake in UFI's success. It's hard to believe he would form UFI with Laurie if the plan all along was to divert union work to a

preexisting non-union company that he only owns 3.3% of all for the purpose of avoiding the CBA they affirmatively chose to take on. Again, this defies common sense.

That transitions well into the intent element, which the record plainly fails to support. As to Laurie, I've already discussed why it doesn't make sense for him to have formed JLF with "a fraudulent intent to avoid collective bargaining obligations." *McCleskey*, 897 F.3d at 903. But there's more. UFI has paid union rates and benefits for its workers since 2000, and it has submitted to the Trust Funds' routine audits nearly every three years throughout its existence without any grievances or audit delinquencies in at least the last ten years. [Stip. at ¶¶92-93, 128.] In the 25 years between the 2000 meeting when UFI was formed and the most recent audit, no one from the Union voiced any concern with how JLF operated, and no union has ever tried to organize JLF's workforce. [Tr. at 253-54, 276.] When JLF installers work UFI projects because of manpower shortage, they are put on the UFI payroll and are paid under the CBA. [Tr. at 307-11.] That is the opposite of evasion. The parties' stipulations name twenty-four flooring installers, most of whom worked substantial hours for JLF but surfaced on UFI's payroll for a month or a few between 2017-2023. [Stip. at ¶¶149-237.] Nothing suggests they weren't paid the full union package for those hours, and the parties separately stipulate that UFI "is in good standing with the Union." [Stip. at ¶93.]

At trial, Plaintiffs raised four instances in which JLF-paid workers appeared on a UFI project, two of them involving below-scale pay, but Plaintiffs' counsel conceded in closing that this evidence was merely "anecdotal." [Tr. at 376.] Notably, in both instances where pay was at issue, workers ultimately received what they were owed

under the CBA. None of this convinces me that anyone intended to evade a union obligation.

Plaintiffs' pretrial theory of motive was that "UFI has utilized JLF in attempt to avoid UFI's obligations under the Union's CBAs." [DE 75 at 4.] It's true that Richard Melton testified that the owners directed him to "funnel" a bid request to JLF when the request carries no labor requirement. [Tr. at 142-45.] But Melton explained that the direction applies only where a customer doesn't require union labor, which he said happens only for public works projects, a category which accounts for about one percent of the companies' work. [Tr. at 145.] Melton further testified that his standing directive is to "grow UFI." [Tr. at 138.] He could not recall a time when he submitted a bid for both companies, and he has never diverted work from UFI or been asked to do so. [Tr. at 155-57.] Whether he bids UFI or JLF depends on the *customer's* labor requirements, and virtually every bid request that comes his way requires union labor. [Tr. at 144, 153.]

Even if intent were presumed, the alter ego theory fails on the other factors—substantially identical management, business purpose, operation, equipment, customers, and supervision. The companies' business purposes overlap in a tiny sliver. They both install commercial flooring and JLF performs all the work UFI performs. [Tr. at 61, 117.] But unlike UFI, JLF provides numerous services beyond commercial flooring, and its work extends to several states beyond Indiana. [Stip. at ¶¶87-88.] UFI does commercial flooring and nothing else, for only a handful of signatory GCs and within sixty miles of Fort Wayne. [Stip. at ¶¶90, 104-08; Tr. at 271.]

Next is common customers. Fourteen of UFI's twenty-five customers between 2019-2024 also did business with JLF, which admittedly isn't a small overlap. [Stip. at ¶¶76-77.] But the only overlapping customer actually discussed in the record—C3 Construction Services—used the two companies for different work on different projects in different years. UFI installed commercial flooring on C3 project in 2019, and JLF's specialty surfaces division worked on a different C3 project in 2022. [Stip. at ¶136.]

Management and supervision aren't identical either. Neither party has pointed to a Seventh Circuit decision spelling out what "substantially identical management" requires, but courts in this circuit applying the "common management" prong have "emphasized common control over hiring and firing of employees, as well as other daily management decisions." *Dynamic Garage*, 2018 WL 4699842, at *6 (N.D. Ill. Sept. 30, 2018) (citing *NLRB v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1288-89 (7th Cir. 1989)); *see also Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen, Dist. Council of Wisconsin & Its Loc. 5*, 724 F.3d 939, 947 (7th Cir. 2013) (explaining that "common management" turns on "actual or active control" and "certainly not formal job titles."). Taken literally, I understand substantially identical management to be a situation where the same people managing the first company manage the second one as well. Under either standard, the people who manage UFI are not the ones managing or controlling JLF.

Klinger and Bermes are UFI's only supervisory employees. [Stip. at ¶112.] They run UFI's day-to-day operations, with Klinger handling oversight of higher-level strategic functions and Bermes supervising its five installers in the field, on projects

almost entirely within sixty miles of Fort Wayne. [Stip. at ¶¶108-09, 112; Tr. at 271-72.] JLF maintains numerous business units that perform projects in multiple states and are managed by multiple field superintendents. [Stip. at ¶¶87-88, 90; Tr. at 149-50, 281]. Melton, who deals with superintendents of both companies, identified Bermes on UFI's side and Chad Loutzenhiser on JLF's—two different men doing the same job at two different companies. [Tr. at 149-50.] The titles Plaintiffs point to do not make a difference. Laurie's corporate secretaryship at UFI is a formal office [See DE 92 at 3, ¶19; Stip. at ¶20.] Nothing in the record suggests he had a hand in UFI's operations under that position or otherwise. They also point to Klinger's CTO position at JLF. [*Id.* at ¶17.] That position reflects a written service agreement where Klinger's IT services are billed by UFI to JLF. [Stip. at ¶¶131-32.] It doesn't reflect any control over JLF's operations.

The record shows one period of shared supervision. From 2019 to mid-2020, two JLF superintendents—Andrew Sanders and Anthony Anzini—ran UFI's field work, and UFI paid JLF for their time under an agreement between the two companies. That was a purchased service, not identical management, and it ended around the time UFI hired Bermes. [Stip. at ¶¶41-46, 143-44.]

One hiring episode cuts in Plaintiffs' favor. At trial, Gresham described an incident in which Bermes asked the Union for an installer. The Union dispatched Dereck LeSure, and LeSure was "denied employment per Alex Samudio," a JLF employee. [Tr. at 99-101.] LeSure met with Bermes at the JLF office to fill out paperwork. [Tr. at 100-01.] Plaintiffs introduced text messages between Gresham and LeSure discussing the incident. They include some colorful language from LeSure,

which I won't repeat in full: LeSure found it "really weird" that a "[J]ack Laurie field manager has the power to overrule the president of UFI . . . . Jack Laurie shouldn't have a mf thing to say about union hiring or firing." [Ex. 28 at CMRCC 000862-63.] Hiring is exactly the kind of daily management decision that's relevant to the common management factor. When Gresham raised the incident with Klinger, he called it a mistake. [Tr. at 102.] UFI compensated LeSure for two hours of show-up pay, including wages and benefits, for reporting to the dispatch. [Tr. at 102.] While favorable to Plaintiffs, I don't find that this hiring episode represents a pattern for JLF and UFI. It was an isolated incident. No witness explained what Samudio was doing or on whose authority. While it blurs the management line for a single day, it's not enough to establish substantially identical management with all else considered.

Finally, while Melton testified that he reports somewhat to Klinger and Laurie in his role at JLM, his day-to-day report is Dave Foellinger, and the upshot of his testimony is that the customer, not the owners, controls which company he decides to bid for a project. [Tr. at 143-44, 150-51, 153.]

As to the business operations prong, the question is "whether one company is dependent upon the other for financial support, whether they share the same facilities, and whether they function jointly on a daily basis." *Duguid*, 761 F. Supp. at 1353. Searl's testimony made clear that neither company is dependent on the other financially, that there is no shared pool of cash, no cross-collateralization, and that each intercompany loan—an infrequent occurrence—was repaid, usually within days. [Tr. at 190, 227-29.]

Nor do they share facilities in any meaningful sense. UFI has no office space and its installers report to jobsites from home. [Stip. at ¶¶124-25; Tr. at 192.]

Finally, the companies don't function jointly. They share a back office (*i.e.*, JLM), but a shared administrative services provider is both common and not indicative of alter ego on its own. *See Bd. of Trs. of Cincinnati Plumbing & Pipe Fitting Indus. Promotion Tr. Fund v. Humbert*, 768 F. App'x 317, 319 (6th Cir. 2019) (holding two companies were not alter egos where they used a common professional services firm); *Nw. Ohio Adm'rs, Inc. v. S.E.A. Builders Corp.*, 183 F. Supp. 2d 991, 994 (N.D. Ohio 2002) (holding two companies were not alter egos where they shared equipment, a phone line, fax machine, and common administrative services); *Cement Masons' Pension Trust-Fund, Detroit & Vicinity v. McCarthy*, No. 04-CV-74006-DT, 2006 WL 770444, at *2 (E.D. Mich. Mar. 24, 2006) (holding two companies were not alter egos despite using the same professional employment organization to handle payroll, tax filings, and insurance benefits). The day-to-day work for each company, and the people performing it, is not substantially identical between the companies.

To round out the factors, shared equipment falls short for Plaintiffs, as counsel conceded in closing. [Tr. at 348.] Neither party had much to say on the matter at trial, and the stipulated facts largely dispose of it. Commercial flooring installation does not generally require large equipment, and UFI—limited to commercial flooring and performing no demolition work—has little need for large or capital equipment of any kind. [Stip. at ¶¶126-27.] Its installers use their own hand tools and report to jobsites from their homes in their own vehicles. [Stip. at ¶¶124, 126.] UFI owns no vehicles at all,

so when materials need to be moved to UFI jobsites, JLM employees deliver them in JLM's own box trucks as part of the services UFI contracts and pays for. [Stip. at ¶147.] Nothing in the record suggests UFI uses equipment owned by JLF or vice versa.

All things considered, Plaintiffs have failed to establish that JLF is the alter ego of UFI. The intent element is entirely unmet. While the common ownership factor cuts in favor of Plaintiffs, it carries little weight on the facts. The other "substantially identical" factors all favor the defendants.

## II. The Single Employer Theory

Plaintiffs argue alternatively that JLF and UFI are in essence a single employer. The single employer doctrine, as the name implies, treats two nominally separate entities as one employer. As with an alter ego finding, the consequence of such is that the non-union entity will be bound to the CBA obligations of its signatory twin. *See Dynamic Garage*, 2018 WL 4699842, at *3, 5. Four factors guide the inquiry—interrelation of operations, common management, centralized control of labor relations, and common ownership. *Lippert Tile,* 724 F.3d at 946. No one factor controls and none are dispositive. Instead, "the decisionmaker must weigh the totality of the circumstances." *Id.* at 946-47. The single employer theory does not have the intent requirement that the alter ego analysis does. *Favia*, 995 F.2d at 789; *Am. Weathermakers*, 150 F. Supp. 3d at 908 n.3. Ultimately, the record must show "the absence of an arm's length relationship found among unintegrated companies." *Lippert Tile,* 724 F.3d at 947.

There is significant overlap between the single employer factors and the ground covered in the alter ego analysis. I nonetheless address each factor. On common

ownership, it's conceded that the companies share owners. Laurie and Klinger both hold ownership shares of UFI and JLF. But as discussed above, I give this factor little weight because the ownership stakes are inverse with Laurie being a controlling owner and operator of JLF with the same for Klinger and UFI.

Common management turns on "actual or active control, as distinguished from potential control, over the other's day-to-day operations, and "certainly not formal job titles." *Lippert Tile*, 724 F.3d at 947. As discussed, UFI is a much smaller company and has only two supervisory employees, Klinger and Bermes. [Stip. at ¶112.] Klinger manages strategic functions like sales, field service operations, and administrative and support matters. [*Id.*] Bermes oversees UFI employees, which includes providing daily assignments, setting work schedules, employee discipline, and supervising employees in the field. [*Id.*] JLF, as the much larger, broader organization, has multiple field supervisors [Tr. at 149-50, 281.], and nothing in the record suggests Bermes supervised JLF employees at JLF jobs. While Plaintiffs identified an isolated incident where JLF employee Alex Samudio got involved in a UFI hiring decision, I don't find that one story is enough to establish common management.

For centralized control of labor operations, courts consider who makes the day-to-day labor decisions at the company, for example setting wages, hiring, and firing. *See Lippert Tile*, 724 F.3d at 947. This factor likewise favors the defendants. First, UFI wages and benefits are fixed by the CBA and administered by UFI. [Stip. at ¶109.] I saw no evidence of anyone at JLF setting wages for UFI or vice versa. Bermes sets work schedules and daily assignments for UFI installers and chooses who comes to

supplement a UFI job when additional manpower is needed. The parties stipulated that Bermes "manages the day-to-day operations in the field" and is responsible for "providing daily assignments, setting work schedules, and employee discipline." [Stip. at ¶112.] Nothing at trial indicated who handles firing at either company, but I take it from the stipulated facts that Bermes' "discipline" role covers that. Nothing suggests he does the same for JLF. Indeed, JLF has multiple separate field superintendents given the size of the company, who perform the same work as Bermes but for JLF employees on JLF projects. [Tr. at 149-50, 281.]

The last factor is interrelation of operations. The Seventh Circuit emphasized that when analyzing this factor, it is the "day-to-day operational matters" that are the most relevant. *Lippert Tile*, 724 F.3d at 947. Factors to consider include whether the companies perform the same labor, in the same area, with the same workforce. *Id*. at 942, 948. Courts have also considered whether the two companies "shared the maintenance of their business records, processed payroll jointly, processed their billing and bank accounts together, and shared space." *Chicago Reg'l Council of Carpenters Pension Fund v. TMG Corp.*, 206 F. Supp. 3d 1351, 1357 (N.D. Ill. 2016) (citing Lippert Tile, 724 F.3d at 947).

This is where Plaintiffs have the strongest case, but it's not enough to establish UFI and JLF are a single employer. As discussed, both companies do commercial flooring installation work. But JLF provides many more services and serves geographic areas well beyond Fort Wayne. Nor do they use the same workforce. JLF employs hundreds of installers compared to just a few for UFI. [Stip. at ¶109; Tr. at 307-08.]

The record shows the workforces merging in two ways. We have the four instances where JLF installers worked UFI projects, and there are twenty-four installers who appeared on UFI's payroll over six years. All of them are identified in the parties' stipulated facts. [Stip. at ¶¶149-237.] As I've discussed, the installers that UFI borrowed from JLF were put on UFI's payroll and paid the union package. The four anecdotal incidents were the exceptions to that rule, and the pay issues were ultimately corrected.

What's more, while both UFI and JLF use JLM to perform administrative functions, that does not, by itself, render them a single employer. *See Humbert*, 768 F. App'x at 319; *SEA Builders Corp.*, 183 F. Supp. 2d at 994. In *Lippert Tile,* the court found three companies were a single employer, in part, because they used a shared back office similar to JLM. *See* 724 F.3d at 947. But "[m]ore importantly," that office included shared estimators who determine which company should bid a particular project, as if the companies "were part of the same organizational chart." *Id*. At trial, Plaintiffs advanced this theory as to Melton, but there's a key distinguishing factor. Bid requests from non-union GCs bypassed Melton entirely and flowed directly to dedicated project managers who have relationships with those GCs. [Tr. at 143.] *Lippert Tile* also tipped the scale in favor of an interrelation finding because the companies "served the same geographic area and performed the exact same labor." *Lippert Tile*, 724 F.3d at 947. As discussed, that's not the case here.

Even with a shared back office, all records and accounts are kept separate—separate databases, bank accounts, lines of credit, payroll accounts, tax returns, financial statements, insurance, balance sheets, and income statements. [Stip. at ¶¶78-79, 99, 113-

23, 148; Tr. at 273-75.] Searl's testimony that he assiduously kept the books and records of the two companies entirely separate was both credible and highly persuasive on this point. Any oddities in the books were isolated errors cherry-picked by Plaintiffs from hundreds of thousands of transactions. [Tr. at 227.] As to the transfers between the companies—which Searl said were rare and always repaid—I don't find those show any commingling of funds, as Plaintiffs contended in the Final Pretrial Order. [DE 75 at 4.]

When considering the totality of the circumstances, I cannot see how these two entities are a single employer. Everything about them is different and separate except for their common owners and shared back office. Nor do I find that there is an absence of an arm's length relationship between the two. They are run by different controlling owners. In the rare instance when one company loaned the other money, those loans were short term and quickly repaid. When Klinger performs IT work for JLF, JLF pays for it. [Stip. at ¶¶131-32.] When UFI needed to outsource a field superintendent from JLF, JLF paid him and UFI paid JLF. Every service that flows between them is bought and paid for pursuant to service agreements. [Stip. at ¶¶131-32; 143-44.] If these two companies were truly one, they wouldn't be paying each other. Plaintiffs have therefore not established that JLF and UFI are a single employer.

## Conclusion

As I observed at trial, if one looked up "tail wagging the dog" in the dictionary, there could be a picture of this case. [Tr. at 353-54.] Plaintiffs ask me to hold a company

with hundreds of employees operating across seven states to a union agreement signed by a small, five-installer commercial flooring shop in Fort Wayne which was established with the explicit approval of the union. Plaintiffs' theory simply doesn't make sense under these facts. And because the record does not support a finding that JLF is the alter ego of UFI or that the two are a single employer, I cannot grant Plaintiffs the extraordinary relief they seek.

**ACCORDINGLY:**

Based on the foregoing findings of fact and conclusions of law, the Clerk of Court is instructed to enter judgment as follows:

It is hereby **ORDERED** that judgment be entered in favor of Defendants and against Plaintiffs on Plaintiffs' claims under Section 502 and 515 of ERISA, 29 U.S.C. §§ 1132, 1145, and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

**SO ORDERED**.

ENTERED: October 15, 2026.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT